IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

ERICK WOODS,

                     Plaintiff/Counterdefendant,

       v.

ADAM RESNICK and F & I SOURCE, LLC,

                 Defendants/Counterclaimants.

OPINION AND ORDER

09-cv-392-slc

---

       This lawsuit involves competing actions for declaratory judgment regarding copyright ownership of a software program pursuant to the Copyright Act, 17 U.S.C. § 101 *et seq.* Plaintiff-counterdefendant Erick Woods and defendant-counterclaimant Adam Resnick are equal partners and owners of F&I Source, LLC, a company that develops, maintains and licenses a web-based software program used in the auto financing industry. Woods seeks a declaration that he is the sole author of the software's source code, while Resnick claims that he is a joint author by virtue of having written source code or having contributed other copyrightable material to the software. Alternatively, defendants Resnick and F&I Source contend that F&I Source owns the copyright in the source code under the work-for-hire doctrine, 17 U.S.C. § 101(1), or by assignment. Jurisdiction is present under 28 U.S.C. §§ 1331 and 1338(a).

       Before the court are the parties' cross-motions for partial summary judgment. I am granting Woods's motion for summary judgment because Resnick has not shown that the contributions he made to the software program are independently copyrightable or that Woods executed a written document assigning his ownership of the copyright to F&I Source. Resnick's motion for summary judgment on his work-for-hire claim will be denied because there is no genuine dispute that Woods created the software before F&I Source was created and was a co-owner, not an employee, of the company.

As a preliminary evidentiary matter, the parties have filed competing motions to strike, dkts. 89 and 96. Resnick and F&I Source have moved to strike Woods's May 11, 2010 affidavit, while Woods has moved to strike the affidavit of Resnick's expert witness, Marvin Solomon, Ph.D. (dkt 78) and Resnick's May 12, 2010 affidavit (dkt. 74). Resnick's motion is essentially moot: first, Woods has submitted an amended affidavit curing the claimed technical defects (failure to assert personal knowledge and attach copies of documents); second, this court, in rejecting defendants' work-for-hire claim, did not rely on Woods's testimony (which defendants assert is a "sham") that he performed independent contractor work after F&I's formation. Woods's motion to strike has more traction, but his objections go more to the weight of the affidavits than their admissibility. I address these arguments below in the analysis portion of this opinion.[1]

For the purpose of deciding the instant motions, I find the following facts to be material and undisputed:

## UNDISPUTED FACTS

Adam Resnick graduated from the University of Wisconsin-Eau Claire in 2000 with a degree in economics. After graduation, he worked at a car dealership, Link Brothers Ford, first as a salesperson, then as finance director. As finance director, Resnick worked with applications such as Microsoft Excel for use in the finance office. In 2002, he left Link Brothers and took a job at Car City Honda as its finance director, where he remained until January 2004.

---

[1] Defendants' response to plaintiff's motion to strike was untimely, due to an oversight by counsel. Although Woods urges the court to disregard the response on that basis, I decline to do so because Woods was not prejudiced by it.

Sometime in 2001 or 2002, Resnick came up with an idea for an electronically-generated finance and insurance management system for use by automotive dealers that would include a dynamic menu presentation system and allow for customization by the user. Resnick developed a "working prototype" of his idea, which consisted of original spreadsheets, hand-written diagrams and notes, other spreadsheets, whiteboard drawings, filemaker applications and flash files. The working prototype created reports or spreadsheets using Microsoft Excel, and performed calculations for leases, credit insurance, finance insurance, simple interest and other sale information. Resnick's employer, Car City Honda, began using Resnick's working prototype toward the end of 2002.

Although Resnick had dabbled a bit in basic computer programming, his expertise was in automotive finance and insurance. Knowing he would need someone with expertise in computer programming to help him develop his system, Resnick turned to his friend Erick Woods, who had been one of Resnick's friends in high school. While in college, Woods had taken some computer courses and worked at a company called Idexx, performing computer software and hardware support. In 1996, Woods obtained an associates degree in Computer Information Systems from Chippewa Valley Technical College. From 1996-2003, he worked as an independent contractor and employee for Imagineering Computer Consultants in Eau Claire. Resnick trusted Woods's level of expertise in computer programming and decided he was the guy to help him launch his project.

In late 2002, Resnick approached Woods with his idea. At that time, there were a number of companies, including JM&A, F&I Menu Works, Universal Underwriters Group and others that had similar finance and insurance products on the market. Although Woods had no

3

plans or thoughts of getting involved in the automotive financing software business before meeting with Resnick, he agreed to work with Resnick to develop the system. The two began working together under the name "F&I Online," which was a working trade name for what became F&I Source, LLC.[2]

In May 2003, Woods began producing the source code for the financing software, which was eventually named the Dealer Finance System. "Source code" is a set of instructions or statements writeable or readable by humans that are used in a computer directly or indirectly to produce a desired result. Resnick deferred to Woods to choose the programming language in which to write the source code; Woods chose the PHP language. Woods worked full-time out of his home, creating the source code primarily in the PHP language on his computer and maintaining it on his own server. In creating the source code for the Dealer Finance System, Woods borrowed some portions of source code from a project he had worked on in 2002 called the Thrift Sale project, making modifications as necessary. Resnick continued to work full time at Car City Honda.

The Dealer Finance System was first ready to be sold to a consumer at the beginning of 2004. Around this time, Resnick left his employment at Car City and he and Woods formed F&I Source, LLC. F&I Source, LLC's sole business is the development, maintenance and licensing of the Dealer Finance System. Woods and Resnick are co-presidents and members of the LLC and 50% owners. The company has no operating agreement or deadlock-breaking agreement.

---

[2] In the automotive industry, "F&I" stands for finance and insurance.

As a member of the LLC, Woods receives monthly draws.  He does not receive any benefits such as health insurance or retirement contributions from F&I Source and does not receive a W-2 statement from the company.  Any compensation Woods has received from F&I Source has been in the form of a distribution of profits from the LLC and accompanied by a K-1 tax statement.  The LLC does not withhold for state or federal taxes any amounts from the distributions it has made to Woods or Resnick, and it has never paid the employers' share of FICA and Social Security with respect to such distributions.  At times, F&I Source employed other people for sales and marketing, including Vicki Rogers, Steve Shaw and Phil Imbery. Payments to these employees were reflected as wages to employees on the annual tax return filed by F&I Source.

After Woods and Resnick formed F&I Source, Woods continued to work primarily at home using his own computer.  Woods's home address is listed as the principal place of business for F&I Source, LLC.  F&I Source, LLC has never leased any part of Woods's home or otherwise paid him rent for the use of his home to perform programming work for F&I Source. Since F&I Source's inception in 2004, Woods has developed, enhanced and maintained the source code and has not engaged in any other employment.  Woods set his own hours and worked independently, without oversight from Resnick, although the two would often exchange task lists and send emails identifying things that needed to be done to the system.

Woods has been involved primarily in the technical side of the business, including maintaining the software, while Resnick has handled the business end, performing sales, marketing and maintaining the books for the company.  Resnick concedes that the bulk of the

source code for the Dealer Finance System was and continues to be written by Woods as the computer programmer for F&I Source.

The Dealer Finance System processes input and output results to assist auto dealers in selling products. It consists of user interfaces and screens that accept input and show output. It has a dynamic menu presentation, is capable of tracking information and is customizable by the user. For example, it allows an auto dealer to run a report showing different payment options for a particular vehicle, including financing, leasing and paying cash, which the dealer can present to a customer. The program calculates sales price, lease payments, finance charges and taxes for specific purchases and provides customers with alternatives for after-market products, such as credit insurance or service contracts. The software is a web-based system, meaning that it does not reside on a user's computer but rather is viewed by the user through a web browser from a remote site. Like all software programs, it requires constant maintenance and updating in order to remain competitive.

The PHP source code for the software provides the input, processing, calculations and outputting for the system. The Dealer Finance System does not use or depend upon Microsoft Excel, which is a pre-existing computer software program designed to run on a local machine and is not an effective program for writing web-based applications. Microsoft Excel contains its own source code to provides step-by-step instructions to the computer to create spreadsheets, but the spreadsheets themselves are not source code. However, similarities exist between the financing formulas Resnick created on his Excel spreadsheets and the formulas expressed in the PHP source code for the Dealer Finance System.

Fifty-two PHP source code-bearing files in the 2003 version of the Dealer Finance System and 134 PHP source code-bearing files in the 2009 version of the application contain the following statement displayed prominently at the top of the files:

> Licensed to F&I Source, LLC at the will and discretion of the sole creator, sole author and sole copyright holder, Erick M. Woods. Unless required by applicable law or agreed to in writing, software is distributed on an "AS IS" BASIS, WITHOUT WARRANTIES OR CONDITIONS OF ANY KIND, either express or implied.
>
> Dealer Finance System
> Copyright 2003 Erick M. Woods.

Woods has a password for access to the source code. Resnick does not. In 2003, the source code was located on a server owned by Woods. Some time after 2003, the source code was moved to a server owned by F&I and then later moved again to Rackspace, for which F&I holds the lease. From 2004 to 2009, the screen displays and printouts from the web site for the Dealer Finance System showed an F&I Source, LLC copyright notice. Woods removed the notices sometime after this litigation began.

Woods has worked on the source code as the computer programmer for F&I Source on nearly a daily basis since the LLC's inception in 2004. During that time, Woods has created, developed, enhanced and maintained the source code for F&I Source and has not engaged in any other employment. Over time, he has taken on a more active role with sales and the day-to-day operation of the business.

After a period of cooperation, the relationship between the parties soured. Woods has filed a state court action for dissolution of the company, which is pending.

# OPINION

## I.  Case or Controversy Requirement

This case does not involve a claim of copyright infringement, but of copyright ownership. Each party seeks a declaration that he or it has an ownership interest in the Dealer Finance System.  Although the Declaratory Judgment Act, 28 U.S.C. § 2201, authorizes such preemptive suits, "the ability to bring suit under that Act does not vitiate the constitutional requirement that the claim address a case of actual controversy." *Wisconsin Central, Ltd. v. Shannon*, 539 F.3d 751, 759 (7th Cir. 2008) (citation omitted).  Whether an actual controversy exists depend on "whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 127 (2007).

Although neither party has addressed the issue of ripeness, I conclude that a substantial, immediate controversy exists between them that warrants a declaratory judgment.  The parties' only business has been the licensing and support of the Dealer Finance System.  As the state court action demonstrates, a substantial legal dispute exists between Woods and Resnick about how to dissolve the partnership and allocate its assets and liabilities.  Determining who owns the copyright in the software, the company's main asset, is an immediate concern of the parties. Accordingly, I am satisfied that this case meets the Constitution's case or controversy requirement.

## II. Summary Judgment Standard

Woods has moved for summary judgment on his claim that he alone authored the source code and therefore owns the copyright in the code.  His motion for summary judgment is "partial" insofar as he does not seek summary judgment regarding the "non-literal" elements of the Dealer Finance System, such as screen displays and reports.  With respect to these non-literal elements, Woods takes the position that they are not original expression and are therefore not entitled to copyright protection.

Resnick and F&I Source, on the other hand, contend that the entire Dealer Finance System is entitled to copyright protection and that Resnick or F&I Source owns the copyright in the software either solely or jointly with Woods.  They have moved for summary judgment on their claim that Woods created, developed and maintained the source code for the Dealer Finance System as an employee of F&I Source, which makes F&I Source the owner of the copyright for the source code under the work for hire doctrine,  17 U.S.C. § 101.  Alternatively, they contend that material disputes of fact exist regarding whether the Dealer Finance System is a joint work by Resnick and Woods and whether Woods assigned any interest in the copyright to F&I Source.

Summary judgment is proper where there is no showing of a genuine issue of material fact in the pleadings, depositions, answers to interrogatories, admissions and affidavits, and where the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  The court must construe all facts and inferences in favor of the nonmoving party; however, this does not extend to drawing inferences supported only by speculation or conjecture: the nonmoving party must do more than raise some metaphysical doubt as to the material facts.  It must come forward

with specific facts showing that there is a genuine issue for trial, that is, that sufficient evidence exists favoring the nonmoving party that would permit a jury to return a verdict for that party. *Argyropoulos v. City of Alton*, 539 F.3d 724, 732 (7th Cir. 2008).

Whether a particular work is copyrightable, however, is an issue of law for the court. *Schrock v. Learning Curve Int'l, Inc.*, 586 F.3d 513, 517 (7th Cir. 2009) (citing *Gaiman v. McFarlane*, 360 F.3d 644, 648-49 (7th Cir. 2004)); *Janky v. Lake County Convention and Visitors Bureau*, 576 F.3d 356, 363 (7th Cir. 2009). *See also Pivot Point Int'l, Inc. v. Charlene Prod., Inc.*, 932 F. Supp. 220, 225 (N.D. Ill.1996) (Easterbrook, J., sitting by designation) (holding that, "[w]hether [items] are copyrightable is a question of law, which the court will decide.... A jury has nothing to do with this subject."); 3-12 Melville B. Nimmer & David Nimmer, Nimmer on Copyright § 12.10[B] (2005) ("determinations of copyrightability in all instances" are reserved to the judge and therefore are appropriate for summary judgment).

## III.  Overview

Before addressing the parties' motions, it is helpful to understand some basic principles regarding computer programs and their treatment under the copyright laws. Computer programs receive copyright protection under the Copyright Act as "literary works." 17 U.S.C. § 102(a)(1) (granting protection to "literary works") and 17 U.S.C. § 101 (defining "literary works" as "works . . . expressed in words, numbers, or other verbal or numerical symbols or indicia, regardless of the nature of the material objects, such as books, periodicals, phonorecords, film, tapes, disks, or cards, in which they are embodied").

Like all other works, however, computer programs enjoy copyright protection only "to the extent that they incorporate authorship in the programmer's expression of original ideas, as distinguished from the ideas themselves."  H.R.Rep. No. 1476, 94th Cong., 2d Sess. 54 (1976), reprinted in 1976 U.S.C.C.A.N. 5659, 5667.  Indeed, "[t]he most fundamental axiom of copyright law is that '[n]o author may copyright his ideas or the facts he narrates.'"  *Feist Publications, Inc. v. Rural Telephone Service Co., Inc.*, 499 U.S.  340, 344-345 (1991) (quoting *Harper & Row, Publishers, Inc. v. Nation Enterprises*, 471 U.S. 539, 556 (1985)).  This concept is embodied in § 102(b) of title 17, which states:

> In no case does copyright protection for an original work of authorship extend to any idea, procedure, process, system, method of operation, concept, principle, or discovery, regardless of the form in which it is described, explained, illustrated, or embodied in such work.

The 1976 House Report on § 102(b) applies this limitation directly to computer programs:

> Some concern has been expressed lest copyright in computer programs should extend protection to the methodology or processes adopted by the programmer, rather than merely to the "writing" expressing his ideas.  Section 102(b) is intended, among other things, to make clear that the expression adopted by the programmer is the copyrightable element in a computer program, and that the actual processes or methods embodied in the program are not within the scope of the copyright law.
>
> H.R.Rep. No. 1476, 94th Cong., 2d Sess. 57 (1976), reprinted in 1976 U.S.C.C.A.N. 5659, 5670.

The utilitarian nature of computer programs and their many different components make application of the idea/expression dichotomy particularly difficult.  A typical computer program contains  "literal" elements, namely the source and object code, as well as "nonliteral elements," namely the products generated by the code's interaction with the computer hardware and

11

operating program(s).  Examples of nonliteral elements of a computer program include its screen displays and the main menu and submenu command tree structure contained thereon.  Although one might infer otherwise, the terms "literal" and "non-literal" do not signify that the former is protected by copyright and the latter is not.  It is well-established that copyright can protect the non-literal structures of a computer program as well as the literal elements.  *Engineering Dynamics, Inc. v. Structural Software, Inc.*, 26 F.3d 1335, 1342 (5th Cir.1994); *Computer Associates International, Inc. v. Altai, Inc.*, 982 F.2d 693 (2d Cir. 1992).

When faced with a question concerning the copyrightability of a computer program (which most often arises as a defense to a claim of copyright infringement), courts typically begin by breaking down the program into manageable components, after which they apply a "filtration" test to determine whether each component is entitled to copyright protection.  *See, e.g., Engineering Dynamics, Inc. v. Structural Software, Inc.*, 26 F.3d 1335, 1342 (5th Cir.1994); *General Universal  Gates Rubber Co. v. Bando Chemical Indus., Ltd.*, 9 F.3d 823 (10th Cir.1993); *Altai*, 982 F.2d at 707-708.  The court's task during the second step is to

> "filter out as unprotectable the ideas, expression necessarily incident to the idea, expression already in the public domain, expression dictated by external factors (like the computer's mechanical specifications, compatibility with other programs, and demands of the industry served by the program), and expression not original to the programmer or author."

*Atari Games Corp. v. Nintendo of America Inc.*, 975 F.2d 832, 839 (Fed. Cir. 1992).

Although the instant case does not involve a claim of infringement, these limiting principles are relevant to determining Resnick's claim of joint authorship.

12

## IV.  Joint Authorship

The Copyright Act defines a "joint work" as "a work prepared by two or more authors with the intention that their contributions be merged into inseparable or interdependent parts of a unitary whole." 17 U.S.C. § 101.  In a joint work the co-authors hold undivided interests in a work, despite any differences in each author's contribution.  17 U.S.C. § 201.  Each author has the right to use or license the use of the work, subject to an accounting to the other co-authors for any profits.  *Erickson v. Trinity Theatre, Inc.*, 13 F.3d 1061, 1068 (7th Cir. 1994); *Weinstein v. University of Illinois*, 811 F.2d 1091, 1095 (7th Cir. 1987).  Thus, even a person whose contribution is relatively minor enjoys a significant benefit, if deemed to be a joint author. *Erickson*, 13 F.3d at 1068.

Merely because two people collaborate to create a work does not make them "joint authors." *Erickson*, 13 F.3d at 1068-69.  As the Court of Appeals for the Seventh Circuit has observed,

> published creations are almost always collaborative efforts to some degree–peers make suggestions, editors tweak words, and so forth. Were we to deem every person who had a hand in the process a co-author, copyright would explode. On the other hand, the very purpose of copyright law is to promote the progress of the arts and sciences, . . . a purpose that is defeated if important contributions are denied copyright protection.  Placing a contribution in one hopper or the other is not always an easy task . . ..

*Janky*, 576 F.3d at 363 (internal citations and quotations omitted).

To establish that his contributions were significant enough to make him a joint author, a party must show that he and the other party 1) intended to create a joint work; and 2) each

contributed independently copyrightable material. *Id*. at 361.[3]

In this case, there is no dispute that Resnick came up with the idea for the creation of the Dealer Finance System and that he provided directions to Woods regarding what the program should do and how it should do it. As Resnick recognizes, however, the fact that the software was his idea is not enough to make him a co-author. *Gaiman*, 360 F.3d at 658 (person who contributes contribute merely nonexpressive elements to a work, such as ideas, suggestions and editorial changes, is not an "author"). To qualify as an author of the computer program, he must have translated his ideas into a fixed, tangible expression entitled to copyright protection. *Reid*, 490 U.S. at 737; 17 U.S.C. § 102; *se also Publications Intern., Ltd. v. Meredith Corp.*, 88 F.3d 473, 481 (7th Cir. 1996) ("Protection for ideas or processes is the purview of patent.").

So, Resnick contends that he contributed the following expressions to the Dealer Finance System: 1) source code; 2) formulas on Excel Spreadsheets that were then "translated" into PHP language and incorporated into the source code; and 3)"mock-ups" of screen designs and reports that are used in the system. I review each contention in turn:

### A.  Source Code

Resnick claims that he wrote source code in 2003 and thereafter, after Woods taught him how to do so. According to Resnick, Woods would sit and watch him write source code because Woods was "lazy." Resnick, however, cannot identify how many lines of source code he wrote,

---

[3] In *Gaiman v. McFarlane*, 360 F.3d 644, 658-59 (7th Cir. 2004), the Court of Appeals found an exception to the requirement of independent copyrightability when "the nature of the particular creative process" is such that none of the constituent parts could pass the test of copyrightability. *Id*. at 659. The work in that case was the creation of a comic book by a writer, a penciler, an inker, and a colorist. Resnick makes no suggestion that the process of creating a software program necessarily involves a similar collaborative process. Accordingly, I find the *Gaiman* exception to be inapplicable in this case.

the subject matter of the code he wrote, or on how many occasions Woods allegedly watched him write source code.  Even so, Resnick contends that he should not be faulted for his inability to identify his contribution to the code because he has been precluded from viewing the source code under the terms of a protective order.

Although I sympathize with Resnick's position, I am not persuaded that he has been stymied by the protective order from proving his joint authorship claim.  Even without viewing the code, Resnick should be able to identify the subject matter of the code, what functions the code he wrote performed, or more specifics about when his side-by-side coding sessions with Woods occurred.  His failure to provide any such information, considered in light of Woods's lack of computer programming experience and lack of access to the code, makes his contention that he wrote source code highly implausible.  At best, Resnick has raised a metaphysical doubt that Woods was the sole author of the source code, which is not enough to defeat the motion for summary judgment.  *See Erickson*, 13 F.3d at 1072 (rejecting claim of joint authorship in play where "actors, on the whole, could not identify specific contributions that they had made to Ms. Erickson's works").

It may be that Woods taught Resnick how to take the Excel formulas that Resnick used for performing various finance calculations and convert them into PHP source code and that Resnick did so on occasion.  However, as discussed in the next section, Resnick has failed to show that his Excel formulas are copyrightable.

15

### B.  Excel Spreadsheets

Resnick contends that he developed a number of spreadsheets to perform calculations central to the function of the Dealer Finance System, such as sale price and balance due, finance charges, interest and interest payments, lease payments and finance reserves, using Microsoft's Excel software application.   According to Resnick, the content of the various cells in his spreadsheets then either were "cut and pasted" by Woods or Resnick into the source code or "recast" into PHP language and used in the source code.  In essence, argues Resnick, it was he who wrote the portions of "code" for the Dealer Finance System that directs the computer to perform various finance calculations; he just happened to write it in a different language.

Woods hotly disputes the technical feasibility of "copying" or "recasting" an Excel spreadsheet into PHP source code and insists that Resnick's spreadsheets are not source code. Woods's approach is too punctilious. Clearly, Simone Beck and Louisette Bertholle were co-authors of *The Art of Mastering French Cooking: Vol. I,* even though their contributions were written in French and had to be translated into English by Julia Child for incorporation into the book.  Similarly, it would seem that the mere fact that Resnick's contributions to the Dealer Finance System were written in a different computer language would not alone prevent him from being deemed a joint author.

In any case, whether Resnick's Excel spreadsheets or formulas actually "appear" in the source code and to what extent is immaterial.  Whether incorporated directly into the source code or merely used as models, Resnick has failed to show that his expressions of finance formulas in his Excel spreadsheets are independently copyrightable.

16

The underlying finance formulas, whether categorized as business logic, algorithms or math equations, cannot themselves be copyrighted. *CCC Information Services, Inc. v. Maclean Hunter Market Reports, Inc.*, 44 F.3d 61, 73 (2d Cir. 1994) (copyright protection not available for "ideas or procedures for doing, making, or building things; scientific or technical methods or discoveries; business operations or procedures; mathematical principles; formulas, algorithms; or any concept, process [or] method of operation") (quoting Copyright Office Circular 31). Instead, it appears that Resnick is contending that his translation of these formulas into Excel formulas is copyrightable?

Resnick's analysis of the copyrightability question is woefully inadequate. All he offers is the conclusory assertion that "[t]he expressions in the spreadsheets possess at least some minimal degree of creativity as compared to the codes/algorithms and arrangements available in the public." Br. in Resp., dkt.77, at 13-14. Resnick does not explain *what* "creativity" was involved or attempt to differentiate his spreadsheets from other F&I spreadsheets on the market.

Further, Resnick offers no response at all to Woods's contention that the doctrine of merger precludes extending copyright protection to Excel equations. The merger doctrine reflects the principle that where the expression is essential to the statement of the idea, or where there is only one way or very few ways of expressing the idea, the idea and the expression "merge" into an unprotectable whole. *See, e.g., Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 387 F.3d 522, 535 (6th Cir. 2004). Additionally, under the doctrine of *scènes à faire*, elements of an original work are not protected if the "'common idea is only capable of expression in more or less stereotyped form.'" *Atari, Inc. v. North American Philips Consumer Electronics Corp.*, 672 F.2d 607, 616 (7th Cir. 1982) (quoting 3 Nimmer, § 13.0316[A][1], at 13-28); *see also Atari Games Corp.*

17

*v. Oman*, 888 F.2d 878, 886 (D.C. Cir.1989) ("The term scènes à faire refers to stereotyped expressions, 'incidents, characters or settings which are as a practical matter indispensable, or at least standard, in the treatment of a given topic'") (citations omitted)).  Resnick makes no suggestion that there were different ways he could have expressed the finance formulas in Excel and still have them work, nor does he suggest that the manner in which he expressed his Excel equations were not dictated by the Excel software.

The report from Resnick's expert, Marvin Solomon, is no more informative on the copyrightability question.  Solomon declares that "the expressions [used by Resnick in his spreadsheets] contain more than a minimal degree of creativity and are copyrightable." Dkt. 78, ¶15.  As defendants concede, however, Solomon is a purported expert in computer science, not copyright law.  He is not qualified to opine whether Resnick's alleged contributions to the software program are "copyrightable."  Solomon does go on to assert that some of the terms and symbols used by Resnick in his spreadsheets were "uncommon or original" and "not anticipated due to any requirements in the marketplace," but he fails to explain what was so unique about Resnick's terms (of which he only identifies three) or what marketplace he is talking about. Assuming that Solomon is referring to the auto finance and insurance market, he offers nothing showing that he is qualified to render an opinion regarding that market.  "Expert reports must include 'how' and 'why' the expert reached a particular result, not merely the expert's conclusory opinions."  *Salgado v. Gen. Motors Corp.*, 150 F.3d 735, 742 n. 6 (7th Cir.1998) (citation omitted).  Solomon's "bottom line" conclusions about the originality of Resnick's expressions lack foundation and are insufficient to show that Resnick contributed independently copyrightable expressions to the Dealer Finance System.

18

Apart from the formulas themselves, Resnick asserts that the "arrangement of content" in his finance calculations is unique and was incorporated into the Dealer Finance System. Although Resnick does not develop this argument in his brief, he asserts in his affidavit that he "elected to display the formulas in a vertical orientation and in a style not found in or dictated by or anticipated by any requirements in the marketplace." Dkt. 74, ¶13. Resnick does not say what "style" he used, much less explain why it was unique; his suggestion that displaying the various steps to be performed in a calculation *vertically* is somehow original is particularly unpersuasive. Surely, copyright protection does not protect the vertical arrangement of a numeric formula.

### C.  Mock-ups of Reports and Screen Displays

Third, Resnick contends that he contributed mock-ups of screen displays and reports that exist in the current Dealer Finance System. The two reports that he identifies are the Finance Report and the Recap Summary Report. As best I can tell, Resnick's "mock-ups" of these reports and displays are the handwritten portions of the 11-page "original prototype" attached as Exhibit 1 to the transcript of Resnick's December 23, 2009 deposition. *See* dkt. 50, exh. B. Again, however, Resnick has failed to make any showing that these reports—which happen to be nearly identical to other F&I reports on the market as early as 1999—are independently copyrightable.

The same goes for Resnick's claim that he created in his mock-ups the "graphic design" of screens and menus that would eventually be used in the system. All he asserts is that these mock-ups "contain sufficient original expression to warrant copyright protection." His mere say-

so, however (or that of his expert), is not enough: a party may not simply make a legal conclusion and expect the court to provide the factual and analytical backfill, particularly in the complex area of intellectual property rights. Absent some meaningful argument to the contrary by Resnick on the subject, I have no basis on which to find that the report and screen display mock-ups constitute independently copyrightable expression.

Having concluded that Resnick has failed to identify any independent copyrightable contribution that he made to the software program, it is unnecessary to consider the issue of intent. Even if Resnick has adduced facts from which a jury could find in his favor on that question, his failure to make any colorable showing of copyrightability in his contributions defeats his claim of joint authorship.

## V.  Work for Hire

Copyright ownership under the Copyright Act "vests initially in the author or authors of the work." 17 U.S.C. § 201(a). Generally, the author is the party who actually creates the work. 17 U.S.C. § 102; *Community for Creative Non-Violence v. Reid*, 490 U.S. 730, 737 (1989).[4] The Act, however, carves out an exception for "works made for hire." The work made for hire doctrine is codified at 17 U.S.C.A. § 201(b), which states:

> Works Made for Hire.-In the case of a work made for hire, the employer or other person for whom the work was prepared is considered the author for purposes of this title, and, unless the parties have expressly agreed otherwise in a written instrument signed by them, owns all of the rights comprised in the copyright.

---

[4] For the purposes of his work-for-hire argument only, Resnick concedes, *arguendo*, that Woods authored the source code.

The statutory definition of a work made for hire is found at 17 U.S.C. § 101, which provides:

> A "work made for hire" is-
>
> (1) a work prepared by an employee within the scope of his or her employment; or
>
> (2) a work specially ordered or commissioned for use as a contribution to a collective work, as part of a motion picture or other audiovisual work, as a translation, as a supplementary work, as a compilation, as an instructional text, as a test, as answer material for a test, or as an atlas, if the parties expressly agree in a written instrument signed by them that the work shall be considered a work made for hire . . ..

The parties agree that Woods and F&I Source never agreed in writing that the source code for the Dealer Finance System was a work made for hire.  This means that the only question this court must consider is whether Woods prepared the source code as "an employee within the scope of his  . . . employment" under §101(1).

In support of his contention that Woods created the source code as an employee of F&I Source, Resnick relies on the Supreme Court's decision in *Reid*, 490 U.S. 730.  In that case, a nonprofit association sought a declaration that, by virtue of the Copyright Act's work-for-hire provision, the association was the exclusive owner of the copyright in a sculpture created by a sculptor with whom it had entered into a verbal agreement for the creation of the work. Reviewing the language, structure and legislative history of the Act, the Court determined that "Congress intended to provide two mutually exclusive ways for works to acquire work for hire status:  one for employees and the other for independent contractors." *Id*. at 747.  The Court explained that to determine whether a hired party is an employee or an independent contractor,

21

courts should apply common law agency principles, considering factors such as

> the skill required; the source of the instrumentalities and tools; the location of the work; the duration of the relationship between the parties; whether the hiring party has the right to assign additional projects to the hired party; the extent of the hired party's discretion over when and how long to work; the method of payment; the hired party's role in hiring and paying assistants; whether the work is part of the regular business of the hiring party; whether the hiring party is in business; the provision of employee benefits; and the tax treatment of the hired party.

*Id.* at 751-52 (footnotes omitted)(citing Restatement (Second) of Agency § 220(2) (1958)).

Applying these factors, the Court found that the sculptor was not an employee of the association but an independent contractor. Apart from the fact that "CCNV members directed enough of Reid's work to ensure that he produced a sculpture that met their specifications," *id*. at 753, all of the other factors weighed against finding an employment relationship: Reid performed a skilled occupation, supplied his own tools, worked in his own studio without daily supervision, set his own hours, was retained for a short period of time for a single project and had total discretion in hiring and paying assistants. In addition, Reid was paid for his work in a fixed sum dependent upon his completion of the sculpture and CCNV did not pay payroll or Social Security taxes, provide any employee benefits or contribute to unemployment insurance or worker's compensation funds. *Id*.

Resnick argues that applying the *Reid* factors leads to the conclusion that Woods created the source code as an employee within the scope of his employment for F&I Source. In the alternative, he points out that Woods admitted that he did not prepare the source code as an independent contractor. Resnick frames his argument as "if not A, then B," arguing that

Woods's concession that he did not work as an independent contractor for F&I Source compels the conclusion that he must have been an employee.

In response, Woods asserts that he is neither A nor B but C: a 50% owner and member of F&I Source, LLC. Because of his undisputed status as a 50% owner of F&I Source, he argues, neither *Reid* nor his concession that he was not an independent contractor bears on the question whether the source code was a work for hire.

I agree with Woods. In *Reid*, there was no question that CCNV had hired Reid to create the sculpture and there was no claim by Reid that he was a member of CCNV. In other words, the existence of an agency relationship was conceded; the question was whether the relationship was that of employer-employee or merely of principal and agent. In contrast, as a co-owner of the company, Woods does not have an agency relationship with F&I Source. Unlike an employee or independent contractor, an owner has an inherent right to control the business. "[T]he attribute of co-ownership distinguishes a partnership from a mere agency relationship. . . . Ownership involves the power of ultimate control." REV. UNIF. PARTNERSHIP ACT § 202(a), cmt. (1997) (citing UNIF. PARTNERSHIP ACT § 6(1) cmt.)). *See also Smith v. Castaways Family Diner*, 453 F.3d 971, 980 (7th Cir. 2006) ("The owner of a business, even if he chooses not to exercise it, always has the right to control the direction and operation of the business.").

As equal partners in the LLC, Woods and Resnick have equal voting rights. *See* Wis. Stat. § 183.0404 (describing voting rights of members of limited liability companies). There is no operating agreement or deadlock-breaking agreement. As a result, unless both of them agree to a particular action, deadlock ensues. In other words, the company does not have the ability

23

to compel either owner to take action.  Under this scenario, there is no basis for finding that Woods was an employee under the control of F&I Source.  *Accord Heimerdinger v. Collins*, 2009 WL 1743764, *4 (D. Utah 2009) (rejecting similar work-for-hire claim on ground that partners are generally not employees of the partnership); *Brown v. Flowers*, 297 F. Supp. 2d 846, 852 (D. N.C. 2003) (plaintiff who alleged in complaint only that he was an equal partner with party asserting copyright ownership did not allege employer/employee relationship and therefore failed to state claim for ownership under work-for-hire doctrine).

*JustMed, Inc. v. Byce*, 600 F.3d 1118 (9th Cir. 2010), cited by defendants, is not directly on point.  Although that case recognized that some of the *Reid* factors tending to show that a party is an independent contractor—such as the hiring party's lack of day-to-day oversight over the other party and failure to pay employment benefits—have less weight given how technology start-ups operate, the company in that case was a corporation, not a limited liability company with two equal members.  Further, as in *Reid*, there was no dispute that the author of the source code was hired by the corporation.  *Id*. at 1126 ("JustMed hired Byce to replace Liebler, an employee, and paid him the same salary that Liebler received.").  In light of the differences between the business entities, *JustMed* does not advance defendants' position.

There is another reason why defendants' work-for-hire theory fails: F&I Source, LLC did not exist at the time Woods prepared the source code.  The company was not formed until early 2004, after Woods had written the source code and assembled a product that was ready for distribution to the public.  Resnick and F&I Source point out that Woods labeled his code with a header containing the name F&I Online, which they contend was the predecessor to F&I Source, LLC.  However, defendants have not submitted any evidence to show that F&I Online

24

was anything more than a working trade name that the parties were using while they developed their project.  The company now claiming to own the copyright simply did not exist at the time Woods created the code.  Under these circumstances, Woods could not have prepared the source code as a work for hire.  *Billy-Bob Teeth, Inc. v. Novelty, Inc.*, 329 F.3d 586, 591 (7th Cir. 2003) (corporation could not establish ownership under work-for-hire theory because it did not exist when author created work).

Not so fast, argue defendants:  Woods is seeking a declaration that he owns the copyright in the source code as it exists *today*, which is different than it was in 2003.  Defendants point out that Woods has made a number of revisions to the code over the years.  Notably, however, defendants have not adduced any evidence that the initial version of the program code was scrapped or rewritten after the date on which F&I Source was formed.  Absent such evidence, I am satisfied that the source code was "created," for purposes of applying the work-for-hire doctrine, when it was first ready to be sold to consumers in early 2004, and that it has not been "re-created" since.

## VI. Alleged Transfer of Ownership from Woods to F&I Source, LLC

Finally, Woods is entitled to summary judgment on Resnick's claim that Woods transferred his ownership interest in the copyright for the source code to F&I Source.  Under 17 U.S.C. § 204(a)

> A transfer of copyright ownership, other than by operation of law,
> is not valid unless an instrument of conveyance, or a note or
> memorandum of the transfer, is in writing and signed by the owner
> of the rights conveyed or such owner's duly authorized agent.

As one court has explained, § 204(a)'s "requirement is not unduly burdensome ... The rule is really quite simple: If the copyright holder agrees to transfer ownership to another party, that party must get the copyright holder to sign a piece of paper saying so." *Effects Associates, Inc. v. Cohen*, 908 F.2d 555, 557 (9th Cir. 1990); *See also Gaiman*, 360 F.3d at 650) ("copyright assignments must be in writing").

Resnick and F&I Source have failed to produce a piece of paper signed by Woods agreeing to transfer copyright ownership to F&I Source. The only written agreement adduced in support of their transfer claim is a service agreement that Woods signed with a third party, 3M Company, Inc., on November 22, 2006. Paragraph 1.3 of that document reads as follows:

> Reservation of Rights. Except for the limited rights herein expressly granted to 3M, all rights in the Software and Services, including but not limited to, the source code of the core F&I Source product line, except for the rights in the 3M Interfaces (as defined herein), are reserved to F&I Source throughout the world for the exclusive use or other disposition by F&I Source at any time, and from time to time, without any obligation to 3M.

Resnick also points out that Woods was involved in drafting and reviewing the terms and conditions in the F&I Source Service Agreement paragraph regarding Copyright Notice and Intellectual Property Rights which states:

> The licensor .... shall remain the sole and exclusive owner of all rights, title and interest in all copyrighted information contained herein. This web site and contents are protected by copyright, trademark and other intellectual property laws.

While these documents could be viewed as circumstantial admissions by Woods, neither is an actual assignment of the copyright from Woods to F&I Source. Instead, the documents confirm the rights that exist between F&I Source and third parties. To be valid, an assignment under § 204(a) must "clearly identify the deal and its basic parameters." *Weinstein Co. v. Smokewood*

26

*Entertainment Group, LLC*, 664 F. Supp. 2d 332, 342 (S.D. N.Y. 2009). Even as between the copyright owner and the alleged licensee, a particular writing must reflect a "clear and equivocal" intention on the part of the copyright owner to transfer ownership. *Id*. at 341. "The purpose of the signed writing requirement is to ensure that the copyright owner deliberately transfers is ownership interest and that the owner does so in way that provides the parties with a clear guide to their rights and responsibilities." *Id*. (citing *Effects Associates*, 908 F.2d at 557). Here, the written documents are not between Woods and F&I Source and they do not contain any terms clearly identifying the terms of any transfer deal between the two. As such, they are insufficient to constitute a valid assignment under § 204(a). *See Venegas-Hernandez v. Asociacion De Compositores, Editores De Musica Latinoamericana (ACEMLA)*, 424 F.3d 50, 60 (1st Cir. 2005) (composer's signed statement that he owned attached list of songs insufficient to support performing rights society's claim, after composer's death, that statement was intended to transfer ownership of songs to society); *Playboy Enterprises, Inc. v. Dumas*, 53 F.3d 549, 564 (2d Cir. 1995) (legend on back of checks issued by magazine publisher to pay artist for paintings prepared for magazine, indicating that payee assigned "all right, title and interest" in described painting, insufficient to transfer copyright in painting to publisher; legend did not mention word "copyright" and evidence was conflicting as to whether parties intended one-time transfer of reproduction rights or transfer that included copyright); *Price v. Fox Entertainment Group, Inc.*, 473 F. Supp. 2d 446, 460 (S.D.N.Y. 2007) (mere existence of partnership and its supporting documents and certificates did not satisfy § 204(a) because "those documents by their terms do not transfer the copyright itself").

27

## VII.  Conclusion

In light of the conclusions above, Woods is entitled to a declaratory judgment that he is the sole and exclusive owner of the copyrights in the Dealer Finance System.  Trial in this case is scheduled for August 30, 2010, but it does not seem to the court that any triable disputes remain.  Not later than July 23, 2010, the parties should advise the court in writing whether they need a trial and if so, identify what issues need to be tried and why.


ORDER

 IT IS ORDERED THAT:

1.  The parties' respective motions to strike, dkts. 89 and 96, are DENIED.

2.  The motion of Erick Woods for partial summary judgment is GRANTED.

3.  The motion of Adam Resnick and F&I Source, LLC for summary judgment on their work-for-hire claim is DENIED.

4.  The clerk of court is directed to enter judgment declaring that plaintiff Erick Woods is the sole and exclusive owner of the copyrights in the source code for the Dealer Finance System.

5.  Not later than July 23, 2010, the parties shall advise the court in writing whether issues remain for the trial that is scheduled for August 30, 2010.


Entered this 16th day of July, 2010.

BY THE COURT:

/s/

STEPHEN L. CROCKER
Magistrate Judge